Filed 5/24/24  P. v. Calhoun CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C097276 |
| Plaintiff and Respondent, | (Super. Ct. No. 22FE006407) |
| v. | |
| OMAR CALHOUN, | |
| Defendant and Appellant. | |

A jury found defendant Omar Calhoun guilty of two counts of pandering and found true multiple aggravating circumstance allegations based primarily on the testimony of a police detective and transcripts of defendant's online messages.  On appeal, defendant argues several items of evidence, including the messages and the detective's testimony, were inadmissible hearsay, and that the trial court erred when it instructed the jury on the aggravating circumstances.  Defendant also claims insufficient evidence supports the aggravating circumstance findings.

1

We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

The prosecution charged defendant with two counts of pandering (Pen. Code, § 266i, subd. (a)(2), unless otherwise stated, statutory section citations that follow are to the Penal Code; counts one and three), one as to an undercover police detective and another as to victim R.D., and one count of pimping (§ 266h, subd. (a); count two) as to R.D. As to counts two and three, the prosecution alleged the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3); unless otherwise designated, rule citations are to the California Rules of Court) and defendant took advantage of a position of trust or confidence (rule 4.421(a)(11)). As to all counts, the prosecution alleged the crime involved planning, sophistication, or professionalism (rule 4.421(a)(8)); defendant engaged in violent conduct indicating a serious danger to society (rule 4.421(b)(1)); defendant had prior convictions that were numerous or of increasing seriousness (rule 4.421(b)(2)); and defendant served a prior term in prison or jail (rule 4.421(b)(3)). The prosecution later dismissed the allegation of violent conduct.

At trial, Detective Anthony Figueroa testified as an expert in pimping culture and discussed his investigation of defendant. He discussed different pimping styles and how pimps groom sex workers by treating them nicely, then encouraging them to "have sex with somebody for money." A "boyfriend pimp" was "more manipulative in nature," while a "gorilla pimp" used more "brute strength and violence."

The detective maintained a Facebook account for undercover investigation work. In the account, he used the name Aaliyah Velasquez. In April 2022, Velasquez's account received a message from "Otis Houn." The detective believed this account belonged to defendant because the account posted a self-portrait picture of defendant, which showed a distinctive facial tattoo. Houn also mentioned he had been in prison for 16 years, and the parties stipulated defendant had been in prison multiple times between 2007 and 2018.

The prosecution walked the detective through 25 pages of text exchanges between Velasquez and defendant and asked the detective to interpret the messages. Among other things, defendant said he was looking for a "stomp down bitch," which the detective understood to mean defendant was looking to recruit a sex worker. Defendant asked Velasquez to "come home," which meant he wanted her to go "with him to be his sex worker." Defendant discussed business practices as a sex worker, his previous sex workers, and Velasquez's online ads. Defendant told Velasquez her "choose up fee" would be $2,000 if she wanted to "trap" with him, which the detective explained meant she had to pay him $2,000 if she wanted to earn money through prostitution with him.

Detective Figueroa also discussed conversations he uncovered between defendant and a Facebook user named "Sadityy Ocasio," whom he determined was R.D. based on the photos on the account. Among other things, defendant referred to himself as "the hardest stepper from Reno ever," which the detective interpreted to mean that defendant was bragging, calling himself the "hardest pimp there is in Reno." He told R.D. they could "build something" together and gave her his phone number. Detective Figueroa explained this meant defendant wanted to earn money with R.D. The two discussed the process of making an escort ad for Mega Personal, a website. Defendant wanted R.D. to be his "bottom bitch," or his "right-hand prostitute."

Finally, Detective Figueroa discussed a series of messages between defendant and another individual, C.O. Defendant said he wanted her to work for him as a sex worker.

The jury found defendant guilty of both pandering counts, but not guilty on the pimping count. The jury also found true the allegations the crimes involved planning, sophistication, or professionalism as to both pandering counts. For the pandering count as to R.D., the jury also found true the allegations the victim was particularly vulnerable, and defendant took advantage of a position of trust or confidence to commit the crime. In a bench trial, the trial court found true the allegations defendant's prior convictions are numerous or of increasing seriousness, and defendant served a prior prison term.

At the sentencing hearing, the trial court noted the numerous aggravating circumstances that had been found true and the lack of mitigating circumstances and imposed the upper term sentence of six years for the first pandering count, with a 16-month sentence (one-third the midterm) for the second pandering count, for a total aggregate sentence of seven years four months.

Defendant filed a timely notice of appeal.

DISCUSSION

I

*Hearsay*

Defendant argues the trial court erroneously admitted the Facebook message logs and Mega Personals ads involving R.D. because both sets of documents were hearsay. Defendant also argues several portions of Detective Figueroa's testimony were inadmissible hearsay opinions that drew conclusions about defendant's guilt. Defendant acknowledges defense counsel did not object to the admission of any of these items, but asserts he received ineffective assistance of counsel. We conclude the issue was forfeited and find no ineffective assistance of counsel.

A.    Additional Background

Before trial, the prosecution filed a motion in limine to admit expert testimony by Detective Figueroa. Defense counsel did not object. The trial court granted the motion, but laid out restrictions for the testimony, saying, "[t]hey cannot testify that [defendant] is a pimp. Obviously that's up for the jury to decide that issue, but they can talk about the general culture surrounding life as it's known in pimping and pandering."

The prosecution proceeded to admit, without objection, Facebook message logs showing messages between defendant and R.D., as well as the other Facebook accounts.

4

The trial court also received into evidence a certificate of authenticity from the document custodian of the message logs.

The prosecution also moved Mega Personals ads featuring R.D. into evidence without objection. The prosecution used the ads to discuss the mechanics of posting an ad for sex buyers and establish R.D. was posting such ads in April 2022. The ad read, "Tired of fake pic[s], then you'll love me. 100 percent real. No bait and switch. Clean and discreet. My exotic looks and bubbly personality are sure to put your mind at ease and have you coming back for more."

Detective Figueroa testified about the ads, R.D.'s pictures, and several of defendant's messages. On appeal, defendant highlights several portions of Figueroa's testimony, including:

(1) a statement that a Mega Personals ad was an "advertisement to lure sex buyers";

(2) statements about R.D.'s pictures, opining that she was dressed "for the purposes of prostitution";

(3) an interpretation of defendant's message referring to himself as the "hardest stepper from Reno" to mean he is "essentially the hardest pimp there is in Reno";

(4) an interpretation of defendant's message about his age and time in the "pen" to mean "he's old, being a 36-year-old, but he's still young at heart, is how I'm taking that, and that he served 16 years in prison";

(5) an opinion that defendant was "grooming" R.D. when he told her they could "build something" and gave her his phone number;

(6) an opinion that defendant was "trying to recruit [R.D.] and to entice her to come over to work for him as a prostitute" when he told R.D. they could earn some money and he would help her take classes;

(7) an interpretation of defendant's message saying he would help "get [R.D.] mobile" to mean that defendant was going to help her get a car;

5

(8) interpretations of R.D.'s messages about posting Mega Personal ads;

(9) an interpretation of defendant's message saying, "I drive across country for the money" to mean that defendant was coming to pick R.D. up, but wanted to know how much money she made;

(10) a characterization of defendant's statements to mean that defendant was "grooming" R.D. and was "not essentially the kind of person that's going to beat on her like a -- for instance, like a gorilla pimp would . . . he's using more like finesse in this conversation."

Defense counsel did not object to any of these statements.

The trial court instructed the jury as to expert testimony using CALCRIM No. 332, which explained the jury was "not required to accept [expert opinions] as true or correct. The meaning and importance of any opinion are for you to decide."

Defense counsel argued in closing the jury should not credit Detective Figueroa's testimony, saying, "Officer Figueroa . . . does not understand these terms as well as he thinks he does and that much should be clear. He gave us a lot of general knowledge about pimping. . . But we are not talking about the general nature of things. We are talking about specifics. We are talking about the specific facts in this case, not generally what happens with pimping. That gives us nothing. That doesn't inform us of anything. We are talking about the facts that were established right here in this courtroom."

B.    Analysis

Under Evidence Code section 353, "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." Thus, a " 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that

6

ground not cognizable." (*People v. Partida* (2005) 37 Cal.4th 428, 434.) Forfeiture extends to asserted violations of the "federal rights to due process and confrontation." (*People v. Burgener* (2003) 29 Cal.4th 833, 869.)

Defendant did not raise any hearsay objections in his motions in limine, during the admission of the messages or ads, or during Detective Figueroa's testimony. Nor did he invoke his federal constitutional rights. Defendant forfeited the issue.

Anticipating this conclusion, defendant argues he received ineffective assistance of counsel because defense counsel failed to object on hearsay grounds.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) To show prejudice, a "defendant must also show ' "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*People v. Torres* (1995) 33 Cal.App.4th 37, 49.) A reviewing court may reject a claim of ineffective assistance of counsel without addressing both components if a defendant makes an insufficient showing as to either prong. (*Strickland,* at p. 697.) " '[A] mere failure to object to evidence . . . seldom establishes counsel's incompetence.' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567.)

### 1.      *Facebook Messages and Mega Personals Ads*

Defendant acknowledges the certification of authenticity as to the Facebook message logs but argues that even if the documents are admissible as business records, the "*content* inside the records of communication," in the form of R.D.'s messages, still qualifies as hearsay and was thus inadmissible. He claims trial counsel should still have objected to their admissibility. We conclude the Facebook records were admissible and trial counsel's failure to object was reasonable.

7

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).)

One exception to the hearsay rule is for a defendant's own statements. (Evid. Code, § 1220.) Similarly, the hearsay statements of a person with whom a defendant is communicating are admissible to give context or meaning to a defendant's statements admitted under Evidence Code section 1220. (*People v. Turner* (1994) 8 Cal.4th 137, 188-189, disapproved on another ground in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5.) Business records "made in the regular course of a business" that are "made at or near the time" of an event or act are also admissible where a custodian of records testifies to their identity or mode of preparation. (Evid. Code, § 1271.)

Some statements do not constitute hearsay because their truth or falsity is irrelevant; it is the making of the statement at all that is relevant. For example, the hearsay rule does not apply to directives or requests. (*People v. Jurado* (2006) 38 Cal.4th 72, 117; *People v. Reyes* (1976) 62 Cal.App.3d 53, 67.) Similarly, in cases involving prostitution, the hearsay rule does not apply to communications that constitute the negotiation of sex acts. (*People v. Dell* (1991) 232 Cal.App.3d 248, 262.) In this context, "the content of the words spoken is irrelevant, the significance is in the fact the words were uttered at all. [Such] statements could be admitted as 'operative facts' or 'verbal acts' because they demonstrated an issue in the case: that the escorts were making verbal offers to enter into contracts of prostitution . . . . The purpose of this evidence, in turn, was to prove appellant's business involved prostitution as an element of the pimping and pandering charges." (*Ibid.*)

"Pandering is a specific intent crime" and criminalizes the " 'knowing and purposeful conduct of any person seeking to encourage "another person" to work with the

8

panderer or another pimp in plying the prostitution trade.' " (*People v. Campbell* (2020) 51 Cal.App.5th 463, 487.)

Here, the Facebook records were admissible as business records. The prosecution provided a certification from the custodian of records indicating that the records were (1) made in the regular course of business; (2) made at or near the time the messages were transmitted; and (3) the custodian had reviewed the records, certified their authenticity, and explained how they were prepared.

Nothing about the certificate or the records indicates they were untrustworthy. The custodian was not required to establish that defendant was the account holder for the records to be admissible. Once the prosecution made a "preliminary showing" of the document's authenticity using circumstantial evidence -- such as defendant's self-portrait on the account -- they were admissible. (*People v. Flinner* (2020) 10 Cal.5th 686, 729; see also *People v. Calhoun* (2019) 38 Cal.App.5th 275, 314-315.) Defendant's dispute as to the identity of the account holder goes only to the weight of the evidence, not its admissibility. (*People v. Flinner*, at p. 727.)

We likewise reject defendant's blanket argument that, even if the records themselves were admissible, R.D.'s statements within the records created a second layer of inadmissible hearsay. As an initial matter, defendant does not identify which statements R.D. made that constitute hearsay. And R.D.'s statements were not admitted for their truth; for example, to prove that she actually had been banned from the Mega Personals website or to show that she was having a difficult time in her life. Rather, they were admitted to show the nature of her relationship with defendant and demonstrate the nature of his business involved prostitution. They were thus admissible to prove the specific intent requirement of pandering. (*People v. Campbell*, *supra*, 51 Cal.App.5th at p. 488.) Because the Facebook logs were admissible, trial counsel could not have successfully objected on hearsay grounds.

9

Defendant argues there was no foundation for the business records exception as to the Mega Personal ads. We agree but see no prejudice in their admission. The only apparent purpose of the ads was to illustrate Detective Figueroa's discussion of how ads for sex work could be posted online and to corroborate the exchanges between defendant and R.D. about R.D. posting ads. Visual aids were not required for the detective to explain the process in an effective way. And, the Facebook message logs, which included screen shots of the Mega Personals website, established defendant was directing R.D. to post ads seeking sex buyers. Accordingly, defendant has not carried his burden to prove the admission of the ads were prejudicial and counsel did not provide ineffective assistance.

2.       *Detective Figueroa's Testimony*

Defendant argues trial counsel provided ineffective assistance by failing to object at various points in Detective Figueroa's testimony and that the detective's "interpretations of the on-line photographs and pages he reviewed were the only evidence relied upon by the prosecution to prove the pandering charge." We conclude the testimony defendant complains of was either permissible or nonprejudicial.

"An expert may give opinion testimony '[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' [Citation.] 'That is not to say, however, that the jury need be wholly ignorant of the subject matter of the expert opinion in order for it to be admissible. [Citation.] Rather, expert opinion testimony " 'will be excluded only when it would add *nothing at all* to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that [those with] ordinary education could reach a conclusion as intelligently as the witness" ' [citation]." [Citation.]' [Citation.] 'The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject

10

to review for abuse of discretion.' [Citation.]" (*People v. Brown* (2014) 59 Cal.4th 86, 101.)

"A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.) "[A]n expert's opinion that a defendant is guilty is both unhelpful to the jury — which is equally equipped to reach that conclusion — and too helpful, in that the testimony may give the jury the impression that the issue has been decided and need not be the subject of deliberation." (*People v. Prince* (2007) 40 Cal.4th 1179, 1227.) An expert may, however, testify in some cases that an element of a crime has been satisfied. (*People v. Torres, supra,* 33 Cal.App.4th at p. 47.)

We find the analysis in *People v. Leonard* (2014) 228 Cal.App.4th 465 persuasive. There, a detective expert in a pandering trial reviewed the defendant's social media postings opined that the defendant was a "finesse pimp" that later developed into a "gorilla pimp[]." (*Id.* at p. 492.) The detective answered affirmatively when asked whether he saw "patterns of behavior in pimping in manipulation and control of women in the testimony" he heard during trial. (*Ibid.*) He also interpreted the defendant's social media postings and said the defendant's style "mimicked successful pimps." (*Ibid.*)

The appellate court divided the testimony into two categories. The testimony interpreting the defendant's social media and opinion that the defendant was attempting to mimic a successful pimp. (*People v. Leonard*, *supra*, 228 Cal.App.4th at p. 493 fn. 9.) The testimony opining what kind of pimp the defendant was and saying what "patterns of behavior in pimping" he saw in the trial testimony was "unhelpful," however, and the court assumed the trial court abused its discretion in admitting it. (*Id.* at p. 493.) The court found any error harmless, however, because the improper testimony was brief, the other evidence against defendant was overwhelming, and the jury was instructed with

11

CALCRIM No. 332, which told the jury it could evaluate the expert opinion testimony for itself. (*Id.* at p. 494.)

Here, as in *Leonard*, Detective Figueroa opined on defendant's social media postings and messages. The detective interpreted defendant's messages on topics including defendant's references to himself as a pimp and his background in prison, defendant's references to "build[ing] something" with R.D., defendant's offer to "get [R.D.] mobile," the process of posting a Mega Personal ad and description of the ad itself, and defendant's reference to driving "across country for the money." None of these explanations of the postings and messages offered opinions on defendant's guilt or innocence; rather, they translated defendant's messages into understandable language in the context of pimping and pandering culture.

The detective's testimony that some of defendant's actions appeared to be "grooming" behavior was similarly admissible. As Detective Figueroa explained, "grooming" was a term used to describe the process to "woo over the victim" so the victim "will do anything to make them happy." A statement characterizing defendant's behavior as "grooming" is thus distinguishable from an opinion as to his guilt or innocence as to pandering; "grooming" describes a particular approach to the victim that may lead to pandering, but it is not itself the crime.

Likewise, Detective Figueroa's statement that defendant was "not essentially the kind of person that's going to beat on her like a -- for instance, like a gorilla pimp would . . . he's using more like finesse in this conversation" was admissible. "Simply because something a defendant does is 'consistent with' the *modus operandi* of some underworld caper, does not make him guilty of an offense." (*People v. Crooks* (1967) 250 Cal.App.2d 788, 792, fn. omitted.) The same can be said of the testimony that R.D.'s appearance was "consistent with" a sex worker's appearance. Neither of these statements opined on defendant's guilt or innocence; they merely described his behavior as similar

12

to illegal behavior and were thus admissible. (*People v. Leonard*, *supra*, 228 Cal.App.4th at p. 493 fn. 9.)

By translating defendant's statements into readily understandable language, the detective's testimony assisted the jury in understanding defendant's behavior in the pimping and pandering culture. And because the statements were admissible, trial counsel did not provide ineffective assistance by failing to object.

To the extent Detective Figueroa did opine on defendant's guilt, as when he said defendant was "trying to recruit [R.D.] and to entice her to come over to work for him as a prostitute," we conclude similarly to *People v. Leonard* that the reference was harmless. (*People v. Leonard*, *supra*, 228 Cal.App.4th at pp. 493-494.) Here, as in *People v. Leonard*, the jury was instructed with CALCRIM No. 332 and could weigh the expert opinion as it saw fit. The offending testimony comprised only a small part of the detective's testimony and the remainder of the testimony, which covered defendant's messages saying he wanted R.D. to work for him and solicit sex work, directed her to create an escort ad, and described himself as a pimp, were persuasive evidence that he was attempting to recruit R.D. as a prostitute. We thus conclude defendant has not established prejudicial error based on trial counsel's failure to object.

## II

### *Jury Instructions*

Defendant claims the jury instructions used for the aggravating circumstances did not adequately inform the jury of the legal requirements for each circumstance. Defendant notes that the applicable pattern jury instructions, which did not exist at the time of trial, include various requirements that were not part of the trial court's instructions. The People respond defendant forfeited this issue because defense counsel did not object to the instructions before the trial court. Even assuming the issue was preserved, however, we see no merit in defendant's argument.

13

A.    Additional Background

At the end of trial, the parties discussed the jury instructions. The prosecution proposed jury instructions for the aggravating factors involving the particular vulnerability of the victim, the sophistication and planning involved in the crime, and the fact defendant took advantage of a position of trust. Defense counsel stated he was satisfied with those instructions.

The trial court instructed the jury on the applicable aggravating factors. First, as to the victim's particular vulnerability, the trial court stated, "The People allege that the alleged victim of the offense charged in Count 2 and 3 was particularly vulnerable. You must determine if this allegation is true. [¶] A victim is vulnerable if he or she is defenseless, unguarded, unprotected, assailable, and susceptible to a Defendant's attack. [¶] The term particularly as used in this instruction means the victim was vulnerable to a special or unusual degree. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proven."

As to the criminal sophistication factor, the trial court stated, "The People allege that the Defendant used planning, sophistication, or professionalism in the commission of the crimes for which he has been charged. [¶] If you find him guilty of Count 1, 2, or 3, you must determine if this allegation is true. [¶] Planning involves formulating a plan or scheme to commit the crimes for which the Defendant has been charged. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

For the position of trust aggravating circumstance, the trial court instructed, "The People allege that the Defendant in the commission of the crimes charged in Counts 2 and 3 took advantage of a position of trust or confidence. You must determine if this allegation is true. [¶] To find this factor to be true, you must conclude that the victim of

14

the crime for which the Defendant was charged trusted or relied upon the Defendant, and that the Defendant used this trust or reliance to assist him in the commission of the crime. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

B.    Analysis

We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) We must review the wording of the jury instruction and assess whether it accurately states the law. (*Ibid.*) We must consider whether a reasonable likelihood exists that the challenged instruction "caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.]" (*Ibid.*) "There is no error in a trial court's failing or refusing to instruct on one matter, unless the remaining instructions, considered as a whole, fail to cover the material issues raised at trial. As long as the trial court has correctly instructed the jury on all matters pertinent to the case, there is no error." (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 277.)

As to the victim's particular vulnerability, defendant argues the trial court did not direct the jury to "consider all surrounding circumstance[s]" or to find that the "defendant's conduct was distinctly worse than the ordinary commission of the crime." But the trial court instructed the jury that "particularly" means "vulnerable to a special or unusual degree," which is consistent with the law and requires a finding the victim was uniquely vulnerable. (*People v. Smith* (1979) 94 Cal.App.3d 433, 436.) In other words, the jury was required to find the victim was distinctly more vulnerable than an ordinary victim. Thus, it was not necessary to further explain defendant's conduct must have been

15

worse than in the "ordinary commission of the crime." Likewise, the trial court instructed the jury to "consider all the evidence." We see little reason why an additional instruction to "consider all surrounding circumstance[s]" would be necessary.

Similarly, defendant argues the criminal sophistication instruction did not define sophistication or professionalism, did not direct the jury to consider the totality of the circumstances, and did not require proof defendant's conduct was distinctly worse than the ordinary commission of the crime. As with the particular vulnerability instruction, we see no risk the jury misapplied the instruction, even absent these elements. First, the given instruction does define "planning," and defendant does not object to the trial court's definition of that term. Because the aggravating circumstance requires "planning, sophistication *or* professionalism," the factor may be satisfied by any one of those three requirements; thus, even if the instruction only permitted a true finding based on defendant's planning, rather than his sophistication or professionalism, the instruction would still be adequate. (Cf. *People v. Duran* (1982) 130 Cal.App.3d 987, 990.) Second, neither "sophistication" nor "professionalism" have legal meanings that are significantly different than the common understanding of the terms. (See CALCRIM No. 3230.) The jury was instructed in CALCRIM No. 200 that any undefined terms were "to be applied using their ordinary, everyday meanings." Thus, any additional definitions were unnecessary. And, as with the particular vulnerability instruction, an additional instruction to consider the totality of the circumstances would not make a difference because the jury was already instructed to consider all evidence.

Finally, defendant argues the position of trust instruction did not require "that the defendant formed a relationship with the victim that allowed him to occupy a position of trust and that his conduct was distinctly worse than an ordinary commission of the underlying crime." The trial court instructed the jury, however, that the factor required "the victim . . . trusted or relied upon the defendant and that the defendant used this trust or reliance to assist him in the commission of the crime." This instruction adequately

16

informs the jury that the victim and defendant must have had a relationship that gave the defendant a position of trust. The instruction also captures the substance of CALCRIM No. 3233, which requires: (1) the defendant had/developed a relationship with the victim; (2) the relationship caused the victim to have confidence in the defendant; and (3) the defendant took advantage of this position of trust or confidence to commit the crime.

Although the criminal sophistication and position of trust instructions did not include an express statement that the aggravating facts must make defendant's conduct "distinctly worse" than an "ordinary commission" of the crime, we disagree the instructions were inadequate as a result. While defendant is correct that an aggravating circumstance must "make[] the offense 'distinctively worse than the ordinary' " (*People v. Black* (2007) 41 Cal.4th 799, 817), "[c]ourts applying that standard have not imagined an abstract, 'ordinary case' to determine whether a finding of an aggravating circumstances is warranted by the facts of the case. Rather, they have considered whether the manner of the crime's commission was distinctively worse 'when compared to other ways in which such a crime could be committed.' " (*Chavez Zepeda v. Superior Court* (2023) 97 Cal.App.5th 65, 89.)

The trial court instructed the jury that, to find defendant guilty of pandering, the prosecution was required to prove: 1) defendant used promises to persuade R.D. to become a prostitute and 2) defendant intended to influence R.D. to be a prostitute. (CALCRIM No. 1151.) The trial court then instructed the jury on the aggravating factors, saying the prosecution was required to prove, beyond a reasonable doubt, that the crime involved a "planning, sophistication or professionalism" and defendant "took advantage of a position of trust or confidence." Because the aggravating circumstance requirements did not overlap with the elements of the crime, the instructions together make clear the jury had to find additional facts, beyond the basic elements of the offense, to find the aggravating factors true. While an express statement that the aggravating facts

17

must make the offense distinctively worse than ordinary is a correct statement of law, we see little chance the jury misapplied the instruction because the trial court omitted such a statement.

We conclude the trial court did not err in its instructions on the aggravating circumstances. We thus need not reach defendant's claim that he received ineffective assistance of counsel because trial counsel failed to object to the instructions; "defense counsel is not required to make futile motions or to indulge in idle acts to appear competent." (*People v. Kendrick* (2014) 226 Cal.App.4th 769, 780.)

III

*Insufficient Evidence*

Defendant argues the jury's findings as to the aggravating circumstances are not supported by sufficient evidence.

We review the sufficiency of the evidence " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the [aggravating circumstance] beyond a reasonable doubt.' " (*People v. Boyce* (2014) 59 Cal.4th 672, 691.) We presume "the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) In making this determination, we do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

A. <u>Particularly</u> <u>Vulnerable</u> <u>Factor</u>

For purposes of the particularly vulnerable factor, " ' "[p]articularly . . . means in a special or unusual degree, to an extent greater than in other cases" ' " and " ' "[v]ulnerability means defenseless, unguarded, unprotected, accessible, assailable, one

18

who is susceptible to the defendant's criminal act." ' " (*People v. DeHoyos* (2013) 57 Cal.4th 79, 154.)

Here, R.D. told defendant she was not at a "good point in her life"; she had been in a car accident in which she sustained serious injuries and did not have a car. She said she was "lost and confused these days" and described her challenges as a mother, saying aside from her parents, she had nobody to rely on. She wanted to make sure defendant wasn't just looking for money. She warned defendant she had mental health issues. Based on R.D.'s personal characteristics, including her precarious life situation and mental health issues, a reasonable jury could conclude that R.D. was particularly vulnerable to defendant's approach.

We reject defendant's assertion that most victims of pandering have histories of "abuse, neglect, or rape," and that R.D. was not more vulnerable than the typical victim. As noted above, "distinctively worse than the ordinary" means only worse " 'when compared to other ways in which such a crime could be committed.' " (*Chavez Zepeda v. Superior Court*, *supra*, 97 Cal.App.5th 65 at p. 89.) Pandering requires a defendant to induce or encourage a victim to become a prostitute through "promises, threats, violence, or by any device or scheme." (§ 266i, subd. (a)(2).) The basic elements of the crime do not require a defendant to target individuals suffering from mental health issues or other difficult life circumstances. Thus, R.D.'s characteristics could make her "particularly vulnerable," regardless of the circumstances of other, hypothetical victims.

B.     Planning Factor

Sophistication, planning, or professionalism can be shown even if a defendant is "not a particularly sophisticated person," so long as the crimes at issue are methodical or involve "significant planning." (*People v. Lai* (2006) 138 Cal.App.4th 1227, 1259.) Planning can be shown by behavior that demonstrates conduct for a specific purpose. (See *People v. Forster* (1994) 29 Cal.App.4th 1746, 1758-1759.)

19

Here, defendant had a clear method of recruiting sex workers that targeted the victims' needs, including money, housing, and love. He also had a specific management structure for those he recruited into prostitution. Even if, as defendant argues, the victims were randomly targeted initially, defendant attempted to fit victims into his plan once he identified them as vulnerable individuals. We likewise find unpersuasive defendant's argument that he "was not engaged in a sophisticated operation" because he was arrested without seeing any profit. Nothing precludes the use of this aggravating factor for a crime that has been foiled.

And, as above, we reject defendant's contentions that his scheme to recruit sex workers was not distinctively worse than the ordinary because his methods were "pretty common." The sophistication of defendant's scheme exceeds the required elements of the pandering offense, and defendant's attempts to manipulate R.D. and fit her into his prostitution scheme could convince a reasonable factfinder that the crime involved more sophistication or planning than was otherwise required.

C.     Position of Trust Factor

A defendant can abuse a position of trust by using his relationship with the victim to achieve his aims in a way that goes "beyond the elements of the offense." (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 155.)

After R.D. conveyed her difficult life situation, defendant told her he would take care of her and her children saying, "I got you and your kids without a question." After she told him she was looking for someone who would make her feel "safe and secure" and who would "always be here" for her, defendant assured her he would "keep you close to me." He assumed a position in R.D.'s life such that he controlled her movements and monitored her location. He reassured her about their relationship and told her he wanted her communicating with him "at all times." Detective Figueroa explained victims could be "manipulated into thinking that the pimp is there for her best interest" and that they

may work for pimps based on their emotional attachment to the pimp.  These facts are adequate to conclude defendant had placed himself in a position of confidence as to R.D. beyond the basic elements of the pandering charge.  There was sufficient evidence to support this factor.

## DISPOSITION

The judgment is affirmed.

_____

HULL, Acting P. J.

We concur:

_____

RENNER, J.

_____

KRAUSE, J.